PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-1823
_____

CRYSTAL DAWN WEIMER

v.

COUNTY OF FAYETTE, PENNSYLVANIA;
OFFICE OF THE FAYETTE COUNTY OF DISTRICT
ATTORNEY;
NANCY D. VERNON, in her official and individual
capacities;
RONALD HAGGERTY, JR.; THOMAS CESARIO;
THOMAS W. PATTON;
BEVERLY ASHTON, in their individual capacities; CITY
OF CONNELLSVILLE

County of Fayette; Nancy Vernon,
                                        Appellants
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D. C. No. 2-17-cv-01265)
Magistrate Judge: Honorable Maureen P. Kelly
_____

Argued April 22, 2020
Before:  HARDIMAN, RENDELL and FISHER, *Circuit Judges*.

(Filed:  August 25, 2020)

Marie M. Jones [ARGUED]
Maria N. Pipak
Michael R. Lettrich
JonesPassodelis
707 Grant Street
Gulf Tower, Suite 3410
Pittsburgh, PA 15219
        *Counsel for Appellants*

Joseph E. Culleiton [ARGUED]
Blank Rome
501 Grant Street, Suite 850
Pittsburgh, PA 15219
        *Counsel for Appellee*

———

OPINION OF THE COURT
———

FISHER, *Circuit Judge*.

Crystal Dawn Weimer spent more than eleven years in prison for murder. After her convictions were vacated, all charges against her were dismissed with prejudice. Weimer then filed suit under 42 U.S.C. § 1983, alleging that the County of Fayette, Pennsylvania; its former District Attorney, Nancy

Vernon; the City of Connellsville; and several city and state police officers violated her rights under the U.S. Constitution and Pennsylvania law. In this interlocutory appeal, we address only a narrow sliver of this sweeping case: whether absolute immunity or, where raised, qualified immunity shields District Attorney Vernon from proceeding to discovery on certain of Weimer's claims.[1]

After assuring ourselves of our jurisdiction, we address each immunity argument in turn. We conclude that, aside from Vernon's approval of the criminal complaint, because Weimer alleges Vernon engaged in investigatory conduct, absolute immunity does not protect Vernon from suit. However, we also hold that Vernon is entitled to qualified immunity as to Weimer's failure to intervene claim and as to Vernon's alleged conduct in directing officers to investigate bite-mark evidence. Thus, we will affirm in part, reverse in part, and remand for further proceedings.

## I

In reviewing a district court's "rulings on Federal Rule of Civil Procedure 12(b)(6) motions to dismiss, our recitation

---

[1] As we explain below, our jurisdiction is premised on the interlocutory appealability of a denial of immunity. We may not, and do not, address issues that are unrelated to immunity. At oral argument, counsel for Fayette County and Vernon conceded that we lack jurisdiction to review the County's appeal because a county "may not raise absolute immunity as a defense to a claim of municipal liability." *See Fogle v. Sokol*, 957 F.3d 148, 156 (3d Cir. 2020) (citing *Owen v. City of Independence*, 445 U.S. 622, 638 (1980)). For the same reason, counsel also conceded that we lack jurisdiction to review Vernon's challenge to Weimer's supervisory liability claim.

of the facts is limited to" the plaintiff's well-pleaded allegations. *Odd v. Malone*, 538 F.3d 202, 205 (3d Cir. 2008). "We accept those facts as true and draw all reasonable inferences" in her favor. *Id.*

## A. The Initial Investigation into Curtis Haith's Murder

In the early morning hours of January 27, 2001, members of the Connellsville Police Department arrived at Curtis Haith's apartment to find Haith, who had been beaten and shot in the face, lying dead outside on the sidewalk. At officers' request, Vernon also came to Haith's apartment to participate in and help direct the investigation.

During their initial search of the crime scene, officers recovered DNA samples and found a significant amount of drug-related evidence inside Haith's apartment. From speaking with Haith's neighbors and friends, police learned that he had attended parties and had hosted a dozen or more people in his apartment on the evening of January 26 and into the morning of January 27.

Officers soon began interviewing people who had attended these parties, including Weimer. When officers arrived at her house, Weimer was still dressed in the clothes she had been wearing the night before. She had minor injuries to her face and foot, and officers observed what looked like mud and blood on her clothes. Weimer told officers that she, Haith, and others had attended a party the night before and that she had given Haith a ride from that party and dropped him off at another party. She then spent the rest of the night at the housing community where her mother and sisters lived. Her cousin, sisters, and then-boyfriend Michael Gibson confirmed her story. Weimer and Gibson also told officers that Weimer injured her foot when they were "horseplaying" a few days earlier. App. 87 ¶ 31. And Weimer said that the blood on her

4

shirt and the injury to her eye were caused by a fight with Gibson. DNA testing later confirmed that the blood on Weimer's clothes belonged to Gibson, and none of the DNA samples collected from the crime scene matched Weimer—in fact, the samples suggested a male DNA profile.

## B. Weimer Is Implicated

In October 2002—over twenty months after the murder—Thomas Beal, whom Weimer had dated before Gibson, told police that Weimer and Gibson killed Haith. According to Beal, Weimer had told him that the blood on her clothes belonged to Haith (which, based on the DNA testing, could not have been correct) and that she and Gibson shot Haith.

Around the same time, the Pennsylvania State Police Cold Case Squad began to assist with the investigation. When reviewing Haith's autopsy photos, a state investigator saw what she believed to be a bite mark on Haith's hand. A Fayette County dentist analyzed the injury. The dentist first concluded that Gibson bit Haith, but after examining teeth impressions for Weimer, she reported she could not identify which set of teeth caused the mark.

A bite-mark expert then reviewed Beal's statement, photos of the injury to Haith's hand, and teeth impressions from Gibson and Weimer. He concluded the bite mark matched Weimer. Later in the investigation, questions arose as to the timing of the bite mark and whether it could have occurred hours or days before the murder. Vernon directed officers to investigate the timing issue, and the expert was asked to update his opinion. Without reviewing additional evidence, he determined the bite occurred seven to ten minutes before Haith's death.

After securing the bite-mark evidence, investigators

5

again spoke with Beal. Although he had previously claimed that Weimer had told him that she and Gibson had killed Haith, he now claimed "a black man named Lonnie" participated in the murder. App. 92 ¶ 47. Investigation into this new story, conducted at the direction of the police and Vernon, revealed that "Lonnie" was incarcerated at the time of Haith's murder. Despite these puzzling changes to his story, Beal remained a key witness.

In August 2003—now over two and a half years since the murder—Conrad Blair contacted police from prison and said that a fellow inmate, Joseph Stenger, had confessed that he was involved in Haith's murder. Vernon and a Connellsville police officer interviewed Blair who told them that Stenger, Weimer, and Beal killed Haith. Blair also gave the interviewers a statement he claimed Stenger had written. The written statement, however, diverged from Blair's account of Stenger's supposed confession—instead of claiming Stenger was involved in the murder, the written statement said he merely helped dispose of evidence in a pond.

Based on this interview and the written statement, Vernon assisted police in assembling a dive team to search the pond. Vernon and several officers also met with Stenger's attorney, who denied that his client wrote the statement.

## C. Proceedings Against Weimer

In late December 2003, despite the conflicting statements from Beal, Blair, and Stenger, officers prepared a criminal complaint charging Weimer with Haith's murder, which Vernon approved. In January 2004—three years after Haith's death—Weimer was arrested.

The case against Weimer fell apart almost immediately. During a preliminary hearing, the Commonwealth called Beal as a fact witness. While on the stand, Beal recanted his

6

previous statements implicating Weimer in Haith's murder. Instead, he testified that an officer "kind of like coaxed me along on how to do it." App. 94 ¶ 57. Following Beal's revelation, the judge dismissed the charges, and Weimer was released.

Nevertheless, investigators continued to focus their efforts on Weimer. In July 2004, Stenger told police he would implicate Weimer in exchange for a lighter sentence for his unrelated convictions. Based on Stenger's new statement, officers again arrested and charged Weimer with Haith's murder.

Eventually, Weimer was brought to trial in Fayette County. On April 7, 2006, a jury convicted her of third-degree murder and conspiracy to commit murder. She was sentenced to fifteen to thirty years in prison.

## D. Weimer Is Exonerated

On October 1, 2015, a judge vacated Weimer's convictions and granted her request for a new trial. Weimer alleges that, at this point, the police officers and Vernon "continued to act in concert to cover up and suppress the wrongful actions that led to . . . Weimer's wrongful convictions" and worked to "re-prosecute[] [her] for . . . [the] murder." App. 100–01 ¶ 86.

During Weimer's postconviction relief and 2016 pretrial proceedings, a great deal of exculpatory evidence came to light. For example, Stenger recanted his prior stories, conceding he knew nothing about Haith's murder and that police had walked him through his testimony. The bite-mark expert also disavowed his trial testimony, stating that his opinion that the bite mark was Weimer's was based on "junk science." App. 102 ¶ 94. In addition, Weimer's counsel discovered letters in Vernon's files from several jailhouse

7

informants. Although the informants had testified at trial that they were not receiving deals in exchange for their testimony against Weimer, the letters revealed that they had indeed asked for deals and may have received them. Finally, an expert reviewed Haith's autopsy report and photos of Weimer's injuries on the morning of Haith's murder. He concluded Weimer's injuries were consistent with her story that she and Gibson had been "horseplaying" a few days before the murder. App. 103 ¶ 95. On June 27, 2016, the charges against Weimer were "dropped with prejudice." App. 103 ¶ 96.

**E. Weimer's Civil Rights Case**

In September 2017, Weimer filed a civil rights suit in the District Court, naming as defendants Fayette County, the Office of the Fayette County District Attorney, the City of Connellsville, several Connellsville police officers, one Pennsylvania State Police officer, and Vernon.

As relevant to this appeal, Weimer's First Amended Complaint alleged that Vernon maliciously prosecuted her in violation of her Fourth and Fourteenth Amendment rights, conspired with police to violate her civil rights, and failed to intervene to prevent officers from violating her constitutional rights.[2] Vernon moved to dismiss, arguing that Weimer failed to state claims for relief and, in any event, that she is entitled

---

[2] Weimer also asserted claims against Vernon for deprivation of liberty without due process in violation of the Fourteenth Amendment and malicious prosecution under Pennsylvania law. The District Court dismissed both claims with prejudice, and those rulings are not at issue in this appeal. Further, as mentioned above, Vernon conceded that we lack jurisdiction to review her challenge to Weimer's supervisory liability claim, and, therefore, we do not discuss that claim here.

8

to absolute immunity. Vernon also argued that, if the District Court determined that Weimer pleaded valid claims and absolute immunity was not available, she was entitled to qualified immunity regarding the failure to intervene claim and for allegedly directing police to investigate the timing of the bite mark.

On September 14, 2018, the District Court issued an opinion granting the motion in part and denying it in part. *See Weimer v. County of Fayette* (*Weimer I*), No. 17-1265, 2018 WL 4404049, at \*16–17 (W.D. Pa. Sept. 14, 2018). First, noting that a prosecutor enjoys absolute immunity when she functions as an advocate, the District Court dismissed Weimer's claims with prejudice to the extent they were premised upon Vernon's alleged prosecutorial misconduct.[3] The District Court dismissed the claims without prejudice, however, to the extent they were premised on Vernon's investigatory acts. In doing so, the Court granted Weimer leave to amend her complaint to allege specific investigatory misconduct by Vernon. Finally, the Court denied the motion to dismiss the malicious prosecution claim only to the extent the claim was premised on Vernon's investigation into the timing of the bite mark. The record, the Court explained, would have to be "further developed as it relates to the bite mark and Vernon's conduct concerning the [bite-mark] investigation . . . before it c[ould] be determined whether she is entitled to qualified immunity on this issue." *Id.* at \*9.

---

[3] Specifically, the Court held that Vernon was entitled to absolute immunity for prosecuting Weimer using false statements and bite-mark evidence, failing to disclose evidence to defense counsel, allowing or encouraging witnesses to testify falsely, and making misleading statements during closing arguments. *Weimer I*, 2018 WL 4404049, at \*9 n.3.

Following the issuance of the September 2018 order, Weimer filed a Second Amended Complaint. The new complaint also asserted malicious prosecution, civil rights conspiracy, and failure to intervene claims against Vernon, and Weimer added additional factual allegations to support these claims. Vernon again moved to dismiss, arguing that Weimer failed to plead Vernon's involvement in the police investigation to support the claims the District Court had dismissed without prejudice. Vernon also argued that if Weimer's Second Amended Complaint adequately stated a failure to intervene claim against her, it should be barred by qualified immunity.

On April 5, 2019, the District Court denied the second motion to dismiss the civil rights conspiracy and failure to intervene claims.[4] *Weimer v. County of Fayette* (*Weimer II*), No. 17-1265, 2019 WL 1509664 (W.D. Pa. Apr. 5, 2019). First, it held that Weimer stated a claim for civil rights conspiracy because the Second Amended Complaint sufficiently alleged Vernon's involvement in the police investigation and her awareness of conflicting evidence throughout the investigation. Second, the Court held that Weimer pleaded facts to support a failure to intervene claim against Vernon and that Vernon was not entitled to qualified immunity on this claim.

Vernon now appeals aspects of both the September

---

[4] The District Court did not address the malicious prosecution claim in the April 2019 order. As we explain in further detail below, the Court's failure to address whether the newly pleaded allegations in the Second Amended Complaint could also serve as factual bases for the malicious prosecution claim seems to us an oversight.

2018 and April 2019 orders.

**II**

Before turning to the merits, we must address an antecedent challenge to our jurisdiction. *See Montanez v. Thompson*, 603 F.3d 243, 248 (3d Cir. 2010) ("We necessarily exercise *de novo* review over an argument alleging a lack of appellate jurisdiction."). The District Court had subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. Weimer argues that we lack appellate jurisdiction under 28 U.S.C. § 1291 because neither of the District Court's orders are reviewable under the collateral order doctrine. According to Weimer, the District Court did not rule on Vernon's entitlement to absolute immunity in the April 2019 order, nor did the determinations in that order turn on issues of law. The rulings in the September 2018 order are not properly before us, Weimer argues, because Vernon failed to appeal any adverse determinations in that order within thirty days as required by Federal Rule of Appellate Procedure 4(a). As we explain below, we hold that we may properly exercise jurisdiction over all issues Vernon raises on appeal.

We have jurisdiction to review "appeals from all final decisions of the district courts." 28 U.S.C. § 1291. District court orders that finally and conclusively "determine claims of right separable from, and collateral to, rights asserted in the [underlying] action" are final for purposes of § 1291 and are immediately appealable. *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949). "[A] district court's denial of a claim of [official] immunity, to the extent that it turns on an issue of law, is an appealable 'final decision'" under the collateral order doctrine because official immunity is an entitlement to avoid the costs of trial and the burdens of broad-reaching discovery. *Mitchell v. Forsyth*, 472 U.S. 511, 526,

11

530 (1985); *see also Kulwicki v. Dawson*, 969 F.2d 1454, 1460–61, 1461 n.7 (3d Cir. 1992) (noting that, unlike a factual claim, such as "the 'I didn't do it' defense," which "relates strictly to the merits of the plaintiff's claim," a claim of official immunity is immediately appealable under the collateral order doctrine). An interlocutory order appealable under the collateral order doctrine must be appealed within thirty days of its entry. Fed. R. App. P. 4(a)(1)(A); *see also In re Montgomery County*, 215 F.3d 367, 372 (3d Cir. 2000) ("The Rule 4(a) deadline for civil cases applies to all appealable orders, including collateral orders, specifically orders denying immunity." (internal quotation marks and citation omitted)).

Our jurisdiction over the immunity determinations in the April 2019 order, which Vernon appealed within thirty days of its entry, is fairly straightforward.

First, the April 2019 order conclusively determined that Vernon is not entitled to absolute immunity. In the September 2018 order, the District Court set out the standard, stating that a prosecutor enjoys absolute immunity "[i]n initiating a prosecution and in presenting the State's case" but not for "investigative evidence-gathering." *Weimer I*, 2018 WL 4404049, at *8 (citations omitted). The Court then permitted Weimer to amend her complaint to allege that Vernon engaged in investigatory misconduct, which would not be protected by prosecutorial immunity. When Weimer amended her complaint, Vernon again moved to dismiss, arguing Weimer was granted limited leave to amend to allege specific investigatory wrongdoing by Vernon but failed to do so. In rejecting her argument, the District Court conclusively denied Vernon's entitlement to absolute immunity at the motion-to-dismiss stage.[5] *See Weimer II*, 2019 WL 1509664, at *9–10,

---

[5] Specifically, the District Court stated that Weimer's Second

12

Second, the April 2019 order conclusively denied qualified immunity on the failure to intervene claim. Although the District Court said it might revisit Vernon's entitlement to immunity at a later stage in the litigation, the practical effect of the order was to require Vernon to proceed to discovery on this claim, despite her argument that she should not be required to do so. *See Oliver v. Roquet*, 858 F.3d 180, 188 (3d Cir. 2017); *George v. Rehiel*, 738 F.3d 562, 571 (3d Cir. 2013).

Our jurisdiction over the September 2018 order is more complicated, but we need not decide whether that order, granting leave to amend, was immediately appealable. Even if the District Court's conclusion regarding the bite-mark investigation in its September 2018 order was immediately appealable under the collateral order doctrine, Vernon's failure to appeal within thirty days did not deprive her of the opportunity to appeal the order's adverse rulings because another appealable order—the April 2019 order—was subsequently entered and timely appealed. Indeed, "several courts of appeals have held explicitly, across a wide range of

Amended Complaint "makes multiple allegations of Vernon's involvement in the police investigation" and, therefore, Vernon is not entitled to absolute immunity on the civil rights conspiracy or failure to intervene claims. *Weimer II*, 2019 WL 1509664, at *9–10. To support this holding the District Court cited a list of paragraphs in the Second Amended Complaint. *See Odd*, 539 F.3d at 210. Here, we conclude we have jurisdiction to review the District Court's denial of absolute immunity, and, below, in Part III.A, we proceed to parse the Second Amended Complaint to determine whether Weimer alleges investigative conduct, to which absolute immunity would not apply.

collateral order appeal circumstances, that failure to take an available collateral order appeal does not forfeit the right to review the order on appeal from a final judgment," as long as the issue has not become moot. 15A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3911 & n.78 (2d ed. 2020) (collecting cases).

One of our sister circuits has taken this concept a step further, holding it had jurisdiction to review two interlocutory orders—both of which effectively denied sovereign immunity to Iran—even though Iran failed to appeal the earlier of the two orders within thirty days. *Rubin v. Islamic Republic of Iran*, 637 F.3d 783, 790–92 (7th Cir. 2011). The court stated that "[t]he failure to timely appeal an immunity order under the collateral-order doctrine . . . postpones review until another appealable order"—including an interlocutory order—"is entered." *Id.* at 791. Therefore, "Iran's timely appeal of [the later-in-time collateral] order permit[ted] review of the earlier—and closely related—immunity decision." *Id.* We, too, have suggested that if the Rule 4(a) deadline is missed, the order is not immediately appealable and the party "must then wait until another appealable order . . . is entered, upon appeal of which [s]he can challenge any interlocutory order that has not become moot." *In re Montgomery County*, 215 F.3d at 372 (citation omitted). Here, we have jurisdiction over the immunity rulings in the September 2018 order because the April 2019 order—which dealt with closely related immunity questions at the motion-to-dismiss stage—was an appealable order, Vernon appealed within the thirty-day window, and the immunity issue was not moot.

A contrary holding would contravene "the historic federal policy against piecemeal appeals." *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 438 (1956); *see also Fed. Home Loan Mortg. Corp. v. Scottsdale Ins. Co.*, 316 F.3d 431, 438

(3d Cir. 2003) (the "finality requirement of 28 U.S.C. § 1291 is grounded 'not in merely technical conceptions of finality,' but rather on a long-recognized policy 'against piecemeal litigation'" (quoting *Catlin v. United States*, 324 U.S. 229, 233–34 (1945))). Under the circumstances of this case, requiring Vernon to either file two separate appeals at the motion-to-dismiss stage or risk forfeiting her appellate rights would be inconsistent with this long-recognized tradition.[6]

---

[6] Weimer argues that Vernon waived her opportunity to appeal the denial of qualified immunity for her alleged conduct in directing police to investigate the bite mark. In her motion to dismiss the Second Amended Complaint, Vernon stated that several of Weimer's claims should be dismissed and Weimer "should only be permitted to proceed on her malicious prosecution claim against Vernon for [Vernon's] alleged involvement in securing bite[-]mark evidence." App. 136–37. Given the unique circumstances of this case, the procedural posture before the District Court, and the rule we describe above, we do not see this statement or Vernon's failure to re-raise the issue of qualified immunity regarding the bite-mark investigation in her second motion to dismiss as fatal to her appeal of that issue. Because the District Court granted Vernon's first motion to dismiss in large measure but gave Weimer limited leave to amend her complaint, Vernon would have reasonably understood that her arguments in the second motion to dismiss should have been directed only to those issues for which Weimer had been granted leave to amend. Accordingly, Vernon's acknowledgement in her motion before the District Court that she would not relitigate issues the District Court had already decided in the September 2018 order did not amount to a waiver of her appellate rights over this argument.

15

Finally, although Vernon's notice of appeal designates only the April 2019 order as the order on appeal, we may still consider the District Court's bite-mark rulings in the September 2018 order. Federal Rule of Appellate Procedure 3(c)(1)(B) requires that a notice of appeal "designate the judgment, order, or part thereof being appealed." However, we "liberally construe[] notices of appeal." *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 184 (3d Cir. 2010) (citation omitted). We may "exercise jurisdiction over orders not specified in the [n]otice of [a]ppeal if: (1) there is a connection between the specified and unspecified orders; (2) the intention to appeal the unspecified order is apparent; and (3) the opposing party is not prejudiced and has a full opportunity to brief the issues." *Id.* (internal quotation marks and citation omitted). Here, there is a connection between the September 2018 order addressing Vernon's first motion to dismiss on immunity grounds and the April 2019 order, in which the District Court conclusively determined that, for the balance of Weimer's claims, Vernon was not entitled to dismissal based on immunity. Vernon's intent to appeal the District Court's denial of qualified immunity regarding her investigation into the bite mark is clear from her opening brief. And Weimer was not prejudiced because she had the opportunity to respond, and did respond, to Vernon's argument on the merits in her answering brief.

## III

Having assured ourselves of our jurisdiction, we turn to the merits. Vernon argues that the District Court erred in failing to dismiss certain of Weimer's claims against her because she is entitled to (A) absolute immunity on all of Weimer's § 1983 claims and (B) qualified immunity on the failure to intervene claim and for her alleged involvement in directing officers to investigate the timing of the bite-mark evidence. Our review of

16

these issues is plenary. *Yarris v. County of Delaware*, 465 F.3d 129, 134 (3d Cir. 2006).

**A. Absolute Immunity**

Section 1983 "provides that every person who acts under color of state law to deprive another of a constitutional right shall be answerable to that person in a suit for damages." *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976) (internal quotation marks and alteration omitted). However, the Supreme Court "has consistently recognized" that the statute "was not meant to abolish wholesale all common-law immunities" available at the time of its enactment in 1871. *Burns v. Reed*, 500 U.S. 478, 484 (1991) (internal quotation marks and citation omitted). Thus, some officials are entitled to "absolute protection from damages liability" because they "perform special functions" similar "to functions that would have been immune when Congress enacted § 1983." *Fogle*, 957 F.3d at 158 (internal quotation marks and citation omitted).

Noting both "a common law tradition of prosecutorial immunity and strong policy considerations that supported extending immunity to the § 1983 context," the Supreme Court has held that prosecutors are immune from suit when they perform prosecutorial functions. *Odd*, 538 F.3d at 208 (citing *Imbler*, 424 U.S. at 420–21, 424). The defense does not protect a prosecutor's actions wholesale merely because she is a prosecutor. *Fogle*, 957 F.3d at 159. Rather, absolute immunity "attaches [only] to actions intimately associated with the judicial phases of litigation, . . . not to administrative or investigatory actions unrelated to initiating and conducting judicial proceedings." *Odd*, 538 F.3d at 208 (internal quotation marks and citation omitted). The prosecutor "seeking absolute immunity bears the burden of showing that such immunity is justified for the [specific] function in question." *Fogle*, 957

17

F.3d at 159 (quoting *Burns*, 500 U.S. at 486). "[T]o earn the protections of absolute immunity" at the motion-to-dismiss stage, "a defendant must show that the conduct triggering absolute immunity 'clearly appear[s] on the face of the complaint.'" *Id.* at 161 (second alteration in original) (quoting *Wilson v. Rackmill*, 878 F.2d 772, 776 (3d Cir. 1989)).

Determining which of a prosecutor's actions were prosecutorial in nature "is a fact-specific" inquiry. *Id.* at 160. We must "ascertain just what conduct forms the basis for the plaintiff's cause of action" and "[t]hen . . . determine what function (prosecutorial, administrative, investigative, or something else entirely) that act served." *Id.* at 161 (internal quotation marks and citation omitted). Importantly, "while we tend to discuss prosecutorial immunity based on alleged *acts*, our ultimate analysis is whether a defendant has established absolute prosecutorial immunity from a given *claim*." *Id.*

As relevant to this appeal, Weimer asserts three claims against Vernon: malicious prosecution, civil rights conspiracy, and failure to intervene. The September 2018 order held that all the allegations in support of these claims (aside from Vernon's participation in the bite-mark investigation) involved prosecutorial misconduct. However, in the April 2019 order, the District Court broadly concluded that Weimer's Second Amended Complaint "makes multiple allegations of Vernon's involvement in the police investigation," so Vernon's entitlement to absolute immunity was not clear on the face of the complaint.[7] *Weimer II*, 2019 WL 1509664, at *9.

---

[7] The April 2019 order addressed only whether the Second Amended Complaint pleaded investigative acts to support the civil rights conspiracy and failure to intervene claims. It did not address the malicious prosecution claim. To be sure, the

To support this holding, the District Court cited numerous paragraphs in the Second Amended Complaint. However, it failed to "dissect[]" Vernon's alleged actions to determine whether they were prosecutorial or investigative in nature. *Odd*, 538 F.3d at 210. Thus, we must now "defin[e] [each] act" that Weimer added to her Second Amended Complaint to determine whether the District Court erred in

_____

September 2018 order had already held that the malicious prosecution claim remained viable to the extent it was premised upon Vernon's investigation into the bite mark. But that order also, as for the other claims, granted Weimer "leave to file a second amended complaint to identify specific wrongful investigatory acts by Vernon" to further support the malicious prosecution claim. *Weimer I*, 2018 WL 4404049, at *10. Vernon's motion to dismiss the Second Amended Complaint reasserted absolute immunity as to all claims for which Weimer was granted leave to amend, including the malicious prosecution claim. It seems to us an oversight that the District Court failed to address whether the newly pleaded allegations in the Second Amended Complaint could also serve as factual bases for the malicious prosecution claim. Accordingly, even though, as we explain in Part III.B.2, Vernon is entitled to qualified immunity on the malicious prosecution claim to the extent the claim is premised on her investigation into the bite-mark evidence, we think the malicious prosecution claim may remain viable to the extent it is premised on other investigative activities—including, as we describe above, Vernon's involvement at the crime scene and investigation into witness statements—to which absolute immunity does not apply and for which qualified immunity was not requested.

19

concluding that these actions were investigative.[8] *See Fogle*, 957 F.3d at 161 (alterations in original) (quoting *Odd*, 538 F.3d at 212).

### 1. Involvement at the Crime Scene

According to the Second Amended Complaint, Vernon arrived at Haith's apartment a few hours after the Connellsville Police Department because a Connellsville detective "requested [her presence at] the crime scene so that she could be involved in and help to direct the murder investigation from the onset of the investigation." App. 86 ¶ 23. During their initial search of the crime scene, officers recovered DNA samples, found drug-related evidence, and learned that Haith had attended parties the night before and morning of his murder. The initial crime-scene investigation led police to interview Weimer because she had attended one of these parties. And, although "DNA testing performed at the crime scene" and later "on . . . Weimer's clothing" confirmed Weimer's account of her whereabouts from the night before and suggested "an unidentified male" was involved in Haith's murder, App. 88 ¶ 32, investigators zeroed in on Weimer, ignoring evidence from the crime scene and other potential leads.

Vernon's alleged role in the initial crime-scene investigation was investigative in nature. Although we must be

---

[8] Vernon appears to concede that she was functioning as an investigator when she investigated the bite-mark evidence. In her opening brief, she argues that she is entitled only to qualified immunity, not absolute immunity, for her alleged participation in the bite-mark investigation. Therefore, we will not separately parse out this conduct to assess whether it was prosecutorial or investigative in nature.

wary of "bright-line rules that would treat the timing of the prosecutor's action" as dispositive, Vernon's alleged act of helping to direct the crime-scene investigation occurred long before a criminal complaint had been drafted and before any suspect had even been identified. *See Odd*, 538 F.3d at 210. Thus, these allegations "point[] more convincingly to 'investigation' than to 'prosecution.'" *See Kulwicki*, 969 F.2d at 1466.

### 2. Participation in Interviews of and Reliance on Statements by Beal, Blair, and Stenger

The Second Amended Complaint alleges that Vernon and the police investigators manipulated evidence and knowingly continued to investigate contradictory witness statements in the period leading up to Weimer's arrest. Specifically, Vernon and the police continued to rely on Beal's statements, despite the fact that one of his versions of Haith's murder involved a man named "Lonnie," who was incarcerated at the time of the murder. In addition, Vernon and several officers interviewed Blair at Vernon's office, and, based on that interview and the contradictory statement allegedly written by Stenger, Vernon helped assemble a dive team to search a pond for evidence and interviewed Stenger's counsel. Even though the written statement contradicted Blair's account of Stenger's involvement, and even though Stenger's counsel denied that Stenger had authored the statement, the investigators continued to rely on the written statement in their investigation into Weimer.

Given these allegations (which we assume here to be true), Vernon cannot show that the defense of absolute immunity appears clearly on the face of the complaint. *See Fogle*, 957 F.3d at 161. This alleged conduct—investigating leads before criminal charges have been filed—is more akin to

21

"the detective's role in searching for the clues and corroboration that might give h[er] probable cause to recommend that a suspect be arrested" than "the advocate's role in evaluating evidence and interviewing witnesses as [s]he prepares for trial." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993); *see id.* at 274–75 (holding prosecutors were acting as detectives rather than advocates when they investigated a bootprint because, at the time, they lacked probable cause to arrest or initiate judicial proceedings against the suspect). And, again, although we resist bright-line rules based on the timing of the prosecutor's alleged activities, the Second Amended Complaint alleges that this misconduct occurred months before Weimer was charged with Haith's murder.

### 3. Approval of the Criminal Complaint

Weimer's Second Amended Complaint alleges that "nearly three years after . . . Haith's murder," the investigation had "uncovered statements made by three different persons—Beal, Blair and Stenger—that were patently inconsistent, and . . . contradicted by known DNA evidence." App. 93 ¶ 53. Nevertheless, Vernon and several officers "agreed to proceed with filing criminal charges against" Weimer. App. 93 ¶ 54. The officers then prepared a criminal complaint, which Vernon approved.

Vernon's approval of the criminal complaint is protected by prosecutorial immunity. We have long maintained that "[t]he decision to initiate a prosecution is at the core of a prosecutor's judicial role." *Kulwicki*, 969 F.2d at 1463; *see also Kalina v. Fletcher*, 522 U.S. 118, 129 (1997) (holding a prosecutor's "activities in connection with the preparation and filing" of a criminal information and motion for arrest were protected by absolute immunity).

\*     \*     \*

22

In sum, Vernon is entitled to absolute immunity only for her alleged conduct in deciding to file and approving the criminal complaint against Weimer. She is entitled to absolute immunity neither for her alleged involvement at the crime scene on the morning of Haith's murder, nor for her investigation into statements by Beal, Blair, and Stenger. To the extent that this investigatory conduct forms the basis of Weimer's malicious prosecution, civil rights conspiracy, and failure to intervene claims against Vernon, we will affirm the District Court's denial of Vernon's motion to dismiss these claims based on absolute immunity.[9]

---

[9] Weimer also alleges that after her convictions were vacated, "the individual Defendants continued to act in concert to cover up and suppress the wrongful actions that led to [her] wrongful convictions," and they "attempted to create additional evidence . . . with the intent of re-prosecuting [her] for . . . Haith's murder." App. 100–01 ¶ 86. Vernon argues that any allegations in the Second Amended Complaint "regarding an after-the-fact cover-up are not investigatory." Appellants' Br. 24. From our review of the Second Amended Complaint, it appears that Weimer alleges broadly that all the defendants worked together to cover up their involvement in the wrongful investigation, but Weimer does not set out any specific wrongful conduct by Vernon during this period. Based on the lack of specificity in the Second Amended Complaint, and based on the fact that Vernon was, by this point, a sitting Court of Common Pleas Judge in Fayette County, it is exceedingly difficult for us to determine whether Vernon would be entitled to absolute immunity for any alleged conduct after Weimer's convictions were vacated and during her pretrial proceedings in 2016. Therefore, we note only that, insofar as Weimer's claims against Vernon remain premised on Vernon's alleged

23

**B. Qualified Immunity**

"Prosecutors who are not entitled to absolute immunity from a plaintiff's claims may nonetheless be entitled to qualified immunity from those same claims." *Yarris*, 465 F.3d at 139. Under the now-familiar standard for the judge-created defense of qualified immunity, a state officer is shielded from a suit for monetary damages under § 1983 unless "the official violated a . . . constitutional right," and "the right was clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (internal quotation marks and citation omitted). "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that [s]he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014). That is, the legal rule must have been "dictated by controlling authority or a robust consensus of cases of persuasive authority." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589–90 (2018) (internal quotation marks and citation omitted). The Supreme Court has repeatedly emphasized that "clearly established law should not be defined at a high level of generality." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) (internal quotation marks omitted). "A rule is too general if the unlawfulness of the [official's] conduct does not follow immediately from the conclusion that the rule was firmly established." *Wesby*, 138 S. Ct. at 590 (alteration, internal quotation marks, and citation omitted).

Vernon contends she is entitled to qualified immunity

participation in an after-the-fact cover up or an effort to prosecute Weimer anew, any absolute immunity defense is not apparent on the face of the Second Amended Complaint. *See Fogle*, 957 F.3d at 161.

24

for her failure to intervene in the allegedly unconstitutional police investigation and for directing police to investigate the timing of the bite mark on Haith's hand.

### 1. Failure to Intervene in the Police Investigation

Weimer alleges that Vernon participated in the reckless and deliberately indifferent police investigation and "had reasonable and realistic opportunities to intervene to prevent the violations of . . . Weimer's constitutional rights." App. 109 ¶ 123. Vernon responds that she is entitled to qualified immunity because, "at the time of the allegations, no clearly established [law] existed to put [her] on notice" that, as a prosecutor, her failure to intervene in the police investigation would violate Weimer's rights. Appellants' Br. 30. We agree.

It is well established in our Circuit that both police and corrections officers must "take reasonable steps to protect a victim from another officer's use of excessive force." *Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002); *see also Baker v. Monroe Twp.*, 50 F.3d 1186, 1193–94 (3d Cir. 1995). But we have not extended this duty to prosecutors who fail to intervene to prevent police from conducting unconstitutional investigations. Accordingly, we cannot say that "any reasonable [prosecutor]" investigating Haith's murder would have understood that she was violating Weimer's constitutional rights in failing to intervene to prevent improper investigatory conduct by police. *See Plumhoff*, 572 U.S. at 778–79. Put differently, the facts here are simply too dissimilar from those in the excessive force cases for us to hold that those cases would have put Vernon on notice that her actions were unlawful.

Although the District Court acknowledged that there was no "case law in the Third Circuit holding a prosecutor liable for a failure to intervene in the conduct of police

25

officers," it identified "[a] subsequent decision from the [Western District of Pennsylvania that] ha[d] extended liability for a failure to intervene claim to prosecutors who [were] engaging in investigative conduct." *Weimer II*, 2019 WL 1509664, at \*10 (citing *Fogle v. Sokol*, No. 17-194, 2018 WL 6831137 (W.D. Pa. Dec. 28, 2018), *aff'd* 957 F.3d at 148).[10] Thus, the District Court permitted Weimer's claim to proceed "[g]iven the recent developments in this area of the law and the early stage of this case." *Id.* at \*12. However, a district court opinion from 2018 cannot serve as a basis for holding that a prosecutor's duty to intervene to prevent an unconstitutional police investigation was clearly established between 2001 and 2006. For a legal principle to be clearly established, it must be based on precedent *existing at the time* of the official's act, and the holding of one district judge, which "is not controlling authority in any jurisdiction, much less in the entire United States," is insufficient to clearly establish a violation of a constitutional right. *al-Kidd*, 563 U.S. at 741–42 (internal quotation marks omitted); *see also Fogle*, 2018 WL 6831137, at \*11–12 (defining its holding as an "extension" of our excessive force case law to prosecutors).[11]

---

[10] Our opinion on appeal in *Fogle* merely affirmed the trial court's denial of the prosecutors' motion to dismiss Fogle's claims based on absolute immunity. *Fogle*, 957 F.3d at 165. Here, in contrast, Vernon has not only requested absolute immunity on the failure to intervene claim, but she also claims that if absolute immunity does not shield her from suit on this claim, qualified immunity applies.

[11] District courts appear to disagree as to whether prosecutors have a duty to intervene in police investigations. *See Patrick v. City of Chicago*, 213 F. Supp. 3d 1033, 1054–55 (N.D. Ill. 2016) (noting courts within its district "are split on whether

Finally, Weimer argues that "the proper inquiry is whether, at the time of the events in 2001 [to] 2004, [she] had the [c]onstitutional right to be free from a reckless and deliberately indifferent police investigation." Appellee's Br. 24. Yet this obscures the fact that Weimer specifically asserted a failure to intervene claim. Whatever might be said of the investigation, the question here is whether Weimer had a clearly established right to have Vernon take reasonable steps to protect her from an unconstitutional police investigation. The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *al-Kidd*, 563 U.S. at 742. Weimer's reframing of the constitutional violation at issue does not change the fact that there was no clearly established law at the time of Vernon's allegedly violative conduct that would have placed the constitutional question she confronted—to intervene in the police investigation or not to intervene—"beyond debate." *See Plumhoff*, 572 U.S. at 779 (citation omitted).

## 2. Investigation into the Timing of the Bite Mark

Weimer alleges that at some point during the investigation, Vernon told officers to investigate the timing of the bite mark on Haith's hand. The bite-mark expert was then

prosecutors have a duty to intervene" and recognizing that there "are good reasons to be cautious in expanding the law . . . to include . . . State's Attorneys"). Disagreement among district judges may, in and of itself, be a reason to recognize a qualified immunity defense. *See Safford Unified Sch. Dist. #1 v. Redding*, 557 U.S. 364, 378 (2009) (noting lower courts had "reached divergent conclusions regarding how the . . . standard [at issue] applie[d]," and stating that "these differences of opinion from our own are substantial enough to require immunity").

"asked to update his opinions to address and eliminate any timing concerns." App. 91 ¶ 45. The expert, without reviewing additional evidence, concluded that the bite occurred shortly before Haith's death. The "Defendants were aware that [the expert] was not provided any additional evidence or materials upon which to base his additional opinions, but nevertheless" continued "to rely upon the manufactured evidence." App. 91 ¶ 45. Vernon argues she is entitled to qualified immunity for directing further investigation into the bite-mark evidence. We agree.

During the relevant time period—from late 2002 to early 2006—the unreliability of bite-mark evidence was not widely recognized such that "any reasonable official in [Vernon's] shoes would have understood that [s]he was violating" Weimer's rights by directing officers to investigate the timing of the bite mark on Haith's hand. *See Plumhoff*, 572 U.S. at 778–79. Despite allegations that the bite-mark expert later referred to such evidence as "junk science" during Weimer's postconviction proceedings, *see* App. 102 ¶ 94, such evidence was widely used in criminal proceedings during and after Weimer's trial, *see* Erica Beecher-Monas, *Reality Bites: The Illusion of Science in Bite-Mark Evidence*, 30 Cardozo L. Rev. 1369, 1375–87, 1408 (2009) (outlining the scientific unreliability of bite-mark evidence and arguing that judges "circumvent[] their gate-keeping responsibilities" by "continu[ing] to admit bite-mark testimony into evidence"); *see also Brewer v. Hayne*, 860 F.3d 819, 824–25 (5th Cir. 2017) (holding forensic odontologists were entitled to qualified immunity when the plaintiffs showed only that the evidence the experts presented at trial in the 1990s was no longer considered trustworthy by later standards and that the experts may have been negligent in their analysis). Thus, based on the law as it existed at the time, Vernon was not on notice that her

28

alleged conduct of directing further investigation into the bite-mark evidence would violate Weimer's rights.

*    *    *

In sum, Vernon is entitled to qualified immunity from Weimer's failure to intervene claim and from the malicious prosecution claim insofar as it relies upon Vernon's direction to investigate the timing of the bite mark.

## IV

For the foregoing reasons, we will affirm in part, reverse in part, and remand for further proceedings consistent with this opinion. To the extent that Vernon's alleged investigatory conduct, as identified above, forms the basis of Weimer's malicious prosecution and civil rights conspiracy claims against Vernon, we will affirm the District Court's denial of Vernon's motion to dismiss these claims based on absolute immunity. We will, however, reverse the District Court's denial of absolute immunity for Vernon's approval of the criminal complaint and its denial of Vernon's motion to dismiss the failure to intervene claim on the basis of qualified immunity. We will also reverse the District Court's denial of qualified immunity for Vernon's alleged conduct in directing officers to investigate the timing of the bite mark. Because qualified immunity shields Vernon from suit for her investigation into the bite-mark evidence, this conduct cannot be used to support Weimer's malicious prosecution claim against Vernon.