# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | |
|---|---|
| Kristen Blackwell, as parent and natural guardian of and on behalf of Kristian Blackwell, <br>         Appellant <br><br>         v. <br><br> City of Pittsburgh, Janine N. Triolo, James Glick, William Vollberg, David O'Neil, Joseph Fabus, Peter Bechtold, Gabriel Figueroa, Jay Johnson, Allegheny County, Russell Carlino, Matt Anderson, Scott Kotanchik, Allegheny County District Attorney's Office, Stephen A. Zappala, Jr., Stephie-Anna Ramaley, Rebecca A. Walker, Alicia Werner, and Melissa Byrnes-Hong-Barco | **CASES CONSOLIDATED** <br><br><br> No. 258 C.D. 2022 <br><br> Submitted: October 8, 2024 |
| Leandre Sims, <br>         Appellant <br><br>         v. <br><br> City of Pittsburgh, Janine N. Triolo, James Glick, William Vollberg, David O'Neil, Joseph Fabus, Peter Bechtold, Gabriel Figueroa, Jay Johnson, Allegheny County, Russell Carlino, Matt Anderson, Scott Kotanchik, Allegheny County District Attorney's Office, Stephen A. Zappala, Jr., Stephie-Anna Ramaley, Rebecca A. Walker, Alicia Werner, and Melissa Byrnes-Hong-Barco | No. 259 C.D. 2022 |

| | | |
|---|---|---|
| Jabril Lee, | : | |
| Appellant | : | |
| | : | No. 260 C.D. 2022 |
| v. | : | |
| | : | |
| City of Pittsburgh, Janine N. Triolo, | : | |
| James Glick, William Vollberg, | : | |
| David O'Neil, Joseph Fabus, Peter | : | |
| Bechtold, Gabriel Figueroa, Jay | : | |
| Johnson, Allegheny County, Russell | : | |
| Carlino, Matt Anderson, Scott | : | |
| Kotanchik, Allegheny County District | : | |
| Attorney's Office, Stephen A. | : | |
| Zappala, Jr., Stephie-Anna Ramaley, | : | |
| Rebecca A. Walker, Alicia Werner, | : | |
| and Melissa Byrnes-Hong-Barco | : | |

| | | |
|---|---|---|
| Brian Bennett, | : | |
| Appellant | : | |
| | : | No. 606 C.D. 2022 |
| v. | : | |
| | : | |
| City of Pittsburgh, Janine N. Triolo, | : | |
| James Glick, William Vollberg, | : | |
| David O'Neil, Joseph Fabus, Peter | : | |
| Bechtold, Gabriel Figueroa, Jay | : | |
| Johnson, Allegheny County, Russell | : | |
| Carlino, Matt Anderson, Scott | : | |
| Kotanchik, Allegheny County District | : | |
| Attorney's Office, Stephen A. | : | |
| Zappala, Jr., Stephie-Anna Ramaley, | : | |
| Rebecca A. Walker, Alicia Werner, | : | |
| and Melissa Byrnes-Hong-Barco | : | |

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
          HONORABLE LORI A. DUMAS, Judge
          HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

**MEMORANDUM OPINION BY**
**JUDGE DUMAS**                                    **FILED:  November 20, 2025**

Kristen Blackwell, as parent and natural guardian of Kristian Blackwell, Leandre Sims, Jabril Lee, and Brian Bennett (collectively, Appellants) appeal from orders entered by the Court of Common Pleas of Allegheny County (trial court), sustaining preliminary objections filed by four groups: (1) Allegheny County Juvenile Probation and Russell Carlino (Juvenile Probation Appellees); (2) the City of Pittsburgh, Detectives Janine N. Triolo, David O'Neil, Joseph Fabus, Peter Bechtold, Gabriel Figueroa, and John Johnson (also known as Jay Johnson), and Sergeants James Glick and William Vollberg (collectively, Police Appellees); (3) Allegheny County, Allegheny County District Attorney's Office (DA's Office), District Attorney (DA) Stephen A. Zappala, Jr., deputy district attorney (DDA) Stephie-Anna Ramaley, DDA Rebecca A. Walker, assistant district attorney (ADA) Alicia Werner, and ADA Melissa Byrnes-Hong-Barco (collectively, DA Appellees); and (4) Probation Officers (PO) Matt Anderson and Scott Kotanchik (collectively, PO Appellees).  We affirm in part, vacate in part, and remand.

## I. BACKGROUND[1]

This case arises from a November 2017 Pittsburgh shooting, in which three minors were injured.  Detective Triolo was assigned as lead investigator and

---

[1] We must "accept as true all well-pleaded, material, and relevant facts alleged in the complaint and every inference that is fairly deducible from those facts," absent any Pa.R.Civ.P. 1028(c)(2) evidentiary hearing.  *Raynor v. D'Annunzio*, 243 A.3d 41, 52 (Pa. 2020) (citation modified); *see also Int'l Union of Operating Eng'g, Local No. 66, AFL-CIO v. Linesville Constr. Co.*, 322 A.2d 353, 356 (Pa. 1974); *see generally Steiner v. Markel*, 968 A.2d 1253, 1258 n.11 (Pa. 2009) (explaining that Pennsylvania is a fact-pleading jurisdiction that requires a plaintiff to plead facts giving rise to an enforceable right).  Unless otherwise stated, we cite to the Blackwell briefs and record.

conducted the investigation over several months. "The shooting occurred when three men" approached the front door seeking a specific individual. Am. Compl., 5/21/21, ¶ 53. Per surveillance footage, the front door was briefly opened twice before shots were fired from the street.

Detective Triolo interviewed two minor witnesses, referred to as Minor 1 (age 10) and Minor 2 (age 9), who purportedly identified Appellants as the assailants. However, both minor witnesses provided inconsistent statements that contradicted surveillance footage and each other.

Further, during the presentation of photo arrays, the minor witnesses identified individuals (other than Appellants) who were never investigated. For instance, when shown a photo array containing Bennett's picture, "Minor 2 identified Brian Bennett and an unidentified individual whose picture was included in the photo array." *Id.* ¶ 84. In reviewing a second photo array, Minor 2 "did not identify Mr. Sims, but did identify two individuals in the third and sixth photographs in the photo array." *Id.* ¶ 88. "Minor 2 stated 'I'm sure'" about the identifications but the "unidentified individuals were never investigated." *Id.* Detective Triolo allegedly "omitted the fact that Minor 2 identified three individuals other than those individuals against whom charges were being pursued" from her affidavit of probable cause. *Id.* ¶ 90.

Within days of the shooting, police obtained electronic home monitoring records showing that Bennett's GPS ankle monitor was at his residence during the incident. The police file contained "a GPS monitor report for Brian Bennett with a print time stamp of 11/28/2017 11:31 AM for the dates of November 24 and November 25, 2017." *Id.* ¶ 75. "The GPS records show that Brian Bennett was at home when the shooting occurred" and "conclusively established that Brian

4

Bennett was not the shooter and not at the site of the shooting." *Id.* ¶ 76. Despite this evidence, Detective Triolo allegedly continued investigating Appellants under a theory that they acted in concert, with Bennett as the shooter, while omitting the GPS records from arrest warrant affidavits. Sergeants Glick and Vollberg oversaw Detective Triolo's investigation. They "reviewed and approved Detective Triolo's reports" and "knew of and sanctioned Detective Triolo's conduct and actions throughout her investigation." *Id.* ¶¶ 113-114. The other individual police officers allegedly assisted the investigation and interrogated Appellants. *Id.* ¶¶ 119-120.

Appellants alleged that the DA Appellees engaged in non-prosecutorial conduct, such as (a) assisting the police with search warrants, witness interviews, and photo arrays, (b) visiting the crime scene, and (c) obtaining grand jury indictments. Subsequently, alibi evidence was obtained, which prompted the DA Appellees to drop the charges. We describe the DA Appellees' alleged conduct further below.

Appellants subsequently filed lawsuits raising, *inter alia*, federal civil rights claims under 42 U.S.C. § 1983 and state law claims for malicious prosecution and false imprisonment.[2] Appellants sued the individual appellees in their individual

---

[2] Specifically, Counts I and II alleged violations of the Fourth, Fifth, and Fourteenth Amendments of the U.S. Constitution and article 1, sections 1, 8 and 9 of the Pennsylvania Constitution against Detectives Triolo, O'Neil, Fabus, Bechtold, Figueroa, and Johnson, Sergeants Glick and Vollberg, DA Zappala, DDAs Ramaley and Walker, and ADAs Werner and Byrnes-Hong-Barco. In short, those claims address the constitutional rights to be secure from unreasonable seizures and due process. Count III alleged constitutional violations against supervisory Sergeants Glick and Vollberg. Counts IV, V, and VI asserted liability under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), against the City of Pittsburgh, the DA's Office, and DA Zappala, respectively, based on constitutional violations. Counts VII, VIII, and IX brought individual liability claims against various probation officers for violating constitutional rights. Counts X and XI asserted failure-to-intervene and civil rights conspiracy claims, respectively, against all individual defendants. *See generally Watkins v. Pa. Dep't of Corr.*, 196 A.3d 272, 275 (Pa. Cmwlth. 2018). Counts XII and XIII brought state malicious prosecution and false imprisonment claims, respectively, against all defendants.

5

capacities and also sued DA Zappala in his official capacity. Each group of appellees filed separate preliminary objections on numerous grounds, which we detail below. The parties agreed to dismiss Carlino from the case with prejudice.

The trial court concisely sustained all preliminary objections, finding, *inter alia*, qualified immunity for Police Appellees and absolute prosecutorial immunity for DA Appellees, and dismissed Appellants' complaints with prejudice. Trial Ct. Op., 2/18/22 (unpaginated). The court succinctly reasoned that *all* of DA Appellees' conduct was prosecutorial in nature, and thus subject to absolute immunity. *Id.* at 4-5 (citing, *inter alia*, *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993), and *Kulwicki v. Dawson*, 969 F.2d 1454, 1463 (3d Cir. 1992)). As for Police Appellees, the court tersely stated that because probable cause existed, they had qualified immunity. *Id.* at 6. Appellants timely appealed and filed Pa.R.A.P. 1925(b) statements.

## II. ISSUES

Appellants raise eight issues, which challenge the trial court's reasoning.[3] Because there are four groups of defendants, we organize the issues as follows: (1) absolute immunity; (2) qualified immunity; (3) derivative liability under *Monell*; (4) failure to intervene; and (5) state claims and immunities.

---

[3] Specifically, Appellants first assert the trial court erred by misapplying the standard for preliminary objections. Second, Appellants claim Police Appellees do not have qualified immunity because the court failed to reconstruct the affidavit of probable cause. Third, DA Appellees do not have absolute prosecutorial immunity when they acted in an investigatory capacity. Fourth and fifth, the court erred by dismissing the *Monell* claims. Sixth and seventh, they maintain the court improperly dismissed their failure-to-intervene claims. Eighth, Appellants insist the court should not have dismissed their state law claims. *See* Appellants' Br. at 2-5. Appellants did not appeal the trial court's dismissal with prejudice of the following claims: Count VII (individual liability) against Carlino; Count X (failure to intervene) as applied to DA Appellees; and Count XI (civil rights conspiracy) against all Appellees.

6

## III. DISCUSSION[4]

### A. Absolute Prosecutorial Immunity for DA Appellees

For context, we state the DA Appellees' alleged conduct. Within a few days of the shooting, ADA Werner "was actively involved in the criminal investigation and in advising the police on how to conduct the investigation, including going to the scene and assisting with search warrants." Am. Compl. ¶ 92. "On December 3, 2017, ADA Werner assisted Detective Triolo with a search warrant for phone records of" Bennett and Sims. *Id.* ¶ 81. On February 8, 2018, she "reviewed and approved" a search warrant application, which specifically noted that "Bennett was on house arrest and that his Facebook page showed an ankle monitor." *Id.* ¶ 98. A few days later, ADA Werner and Detective Triolo interviewed Minor 1, and then viewed the crime scene. In March 2018, ADA Werner "continued to be involved in the" investigation, "including assisting in getting several search warrants for Facebook accounts." *Id.* ¶ 103. The next month, she "again assisted Detective Triolo in obtaining another search warrant." *Id.* ¶ 107. In sum, she aided police during the pre-charging investigation by assisting with search warrants, attending witness interviews, and visiting the crime scene. *Id.* ¶ 99.

Likewise, DDA Ramaley "assisted and approved the photo array" for Blackwell in December 2017. *Id.* ¶ 93. In January and February 2018, ADA Byrnes-

---

[4] Our standard of review is *de novo* and a "demurrer should be sustained only in cases that clearly and without a doubt fail to state a claim for which relief may be granted." *Raynor*, 243 A.3d at 52 (citation modified). Like a demurrer, a federal motion to dismiss "tests the legal sufficiency of the complaint." *Pinkney v. Meadville*, 648 F. Supp. 3d 615, 624 (W.D. Pa. 2023) (citation omitted). "A court considering a preliminary objection may take evidence and create a factual record." *Rehab. & Cmty. Providers Ass'n v. Dep't of Hum. Servs.*, 283 A.3d 260, 271 (Pa. 2022) (*Rehab*) (citation modified); *see also* Pa.R.Civ.P. 1028(c)(2) ("If an issue of fact is raised, the court shall consider evidence by depositions or otherwise."). We may affirm on any grounds evident of record. *Mazer v. William Bros. Co.*, 337 A.2d 559, 562 n.6 (Pa. 1975). Some parties erred by, *inter alia*, conflating federal and state pleading standards and immunities. *See generally Pearson v. Callahan*, 555 U.S. 223, 239 (2009).

7

Hong-Barco similarly assisted Detective Triolo "regarding search warrants for Facebook." *Id.* ¶ 94, 96. In June 2018, police arrested Appellants.

"In July 2018, under the direction and supervision of" DA Zappala, DDAs Walker and Ramaley, and ADA Werner presented evidence to, and received indictments from, a grand jury. *Id.* ¶ 124. During Appellants' 15 months of incarceration, alibi evidence was obtained. In March 2019, Lee's counsel filed a notice of alibi with evidence that Lee, Blackwell, and Sims "could not have been the assailants. The alibi evidence included Lyft rides to an address on the North Side of Pittsburgh - far from the shooting." *Id.* ¶ 127.

Meanwhile, ADA Werner had left the DA's Office, and the case was transferred to ADA Byrnes-Hong-Barco, who went on maternity leave. DA Zappala did not reassign the case to another ADA. It was not until September 2019 that "ADA [Byrnes-]Hong-Barco interviewed [the] alibi witnesses for [the] first time." *Id.* ¶ 128. Shortly after, ADA Byrnes-Hong-Barco petitioned to drop all charges. For Bennett, the petition cited "electronic home monitoring records received by juvenile probation on September 17, 2019, and [stated that after the Commonwealth notified] all families of named victims which was not completed until September 23, 2019 at 2:20 [p.m., the] Commonwealth is unable to proceed." *Id.* ¶ 38 (citation modified). For the remaining Appellants, the petitions stated that "after interviewing alibi witness[es] on September 25, 2019 at 10:30 [a.m.], the first time the Commonwealth was provided with the opportunity, along with other statements obtained and records, [it] will not proceed with the charges." *Id.* ¶ 40.

### 1. Arguments

Appellants contend that DA Appellees lack absolute immunity for "administrative or investigatory actions unrelated to initiating and conducting

8

judicial procedures." Appellants' Br. at 32 (citation modified). They argue that DA Appellees lack absolute immunity for investigative conduct taken before probable cause was established. *Id.* at 33. Specifically, Appellants characterize ADA Werner's extensive pre-charging activities as detective work, ADA Byrnes-Hong-Barco's alibi witness interviews as investigatory, and DA Zappala's failure to investigate alibis as administrative. *Id.* at 39-40.

DA Appellees respond that they possess absolute immunity for prosecutorial actions, which includes their grand jury presentations. DA Appellees' Br. at 25. They contend that ADA Byrnes-Hong-Barco's review of Bennett's electronic home monitoring records, notification of victims' families, and interviewing alibi witnesses constitute "textbook example[s]" of prosecutorial actions. *Id.* at 19-20. DA Appellees argue that their assistance with search warrants and witness interviews also qualify as prosecutorial functions. *Id.* at 26.

### 2. Legal Standards

Under Section 1983, persons acting under color of state law may be liable for constitutional violations, but prosecutors have absolute prosecutorial immunity for prosecutorial actions.[5] *Fogle v. Sokol*, 957 F.3d 148, 158-59 (3d Cir. 2020).[6] The line between prosecutorial and non-prosecutorial actions "is far from clear." *Kulwicki*, 969 F.2d at 1465.

Prosecutorial actions include conduct "intimately associated with the judicial phase of the criminal process," and not "investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial

---

[5] Section 1983 preempts immunity defenses based on state law. *Williams v. Reed*, 604 U.S. 168, 174 (2025); *Howlett v. Rose*, 496 U.S. 356, 376-77 (1990); *Watkins*, 196 A.3d at 274. *But see* Trial Ct. Op. at 5 (citing *Durham v. McElynn*, 772 A.2d 68 (Pa. 2001), in apparently holding that prosecutors are immune to Section 1983 claims).

[6] We follow the Third Circuit whenever possible. *Marshall v. Se. Pa. Transp. Auth.*, 300 A.3d 537, 540 n.2 (Pa. Cmwlth. 2023).

9

proceedings." *Fogle*, 957 F.3d at 159-60 (citation modified). For example, "conduct in beginning a prosecution, including soliciting false testimony from witnesses in grand jury proceedings and probable cause hearings, presenting a state's case at trial, and appearing before a judge to present evidence," are prosecutorial actions falling within absolute immunity. *Id.* at 160 (citation modified). Additionally, "the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made," are prosecutorial actions. *Buckley*, 509 U.S. at 273.

In contrast, prosecutors lack absolute immunity for investigative actions, which includes searching for evidence supporting probable cause. *Id.* "Evidence gleaned prior to the filing [of the criminal complaint] is deemed investigative. Certain pre-filing interactions with the police are investigative, such as directing evidence-gathering, or giving probable cause advice." *Kulwicki*, 969 F.2d at 1465 (citation modified). "Evidence obtained at or after the filing is likely to be connected with an existing prosecution and is absolutely protected." *Id.* (citation modified) (cautioning against bright-line rules). However, the existence of probable cause does not guarantee absolute immunity for subsequent conduct if prosecutors engage in investigative work. *Buckley*, 509 U.S. at 274 n.5.

In *Buckley*, after three separate lab studies failed to connect a boot print to the defendant, prosecutors obtained a positive identification from an expert allegedly "known for her willingness to fabricate unreliable expert testimony." *Buckley*, 509 U.S. at 262. The High Court found this evidence fabrication during the preliminary investigation constituted investigative work rather than prosecutorial advocacy. *Id.* at 274-75.

Similarly, in *Fogle*, a prosecutor had instructed a hypnotist "to use

10

undue suggestion" to obtain a witness statement, which provided probable cause. *Fogle*, 957 F.3d at 161 (citation modified). The court held that the prosecutor "was not acting as an advocate interviewing witnesses as he prepared for trial; instead, he was investigating the theory of his case by searching for clues." *Id.* at 163 (citation modified). A prosecutor's alleged "involvement at the crime scene on the morning of [the] murder" and "investigation into statements" that occurred "months before [the defendant] was charged" was unprotected investigatory conduct outside the scope of absolute immunity. *Weimer v. Cnty. of Fayette*, 972 F.3d 177, 189-90 (3d Cir. 2020). In contrast, a prosecutor had absolute immunity for withholding "material exculpatory evidence . . . ; [filing] a criminal complaint without probable cause; and [committing] perjury before and during trial." *Fogle*, 957 F.3d at 164 (citation modified); *Weimer*, 972 F.3d at 189 (immunizing approval of criminal complaint).

So, at the preliminary objection stage, a trial court must engage in a two-step analysis: (1) identify the conduct underlying the plaintiff's claim; and (2) "determine what function (prosecutorial, administrative, investigative, or something else entirely) that act served." *Fogle*, 957 F.3d at 161 (citation modified) (resolving analogous federal Fed.R.Civ.P. 12(b)(6) motion to dismiss). In determining "the function being performed," the court must not defer to "the timing of the prosecutor's action (*e.g.* pre- or post[-]indictment)." *Id.* at 164 (citation omitted). Instead, the court must focus "on the unique facts of each case," carefully dissect "the prosecutor's actions," and avoid applying "bright-line rules." *Id.* at 160 (citation modified).

Careful dissection is necessary because the High Court refused to "extend absolute immunity" to all prosecutors "who engage in necessary official

11

acts." *Kulwicki*, 969 F.2d at 1465 (quoting *Hafer v. Melo*, 502 U.S. 21, 28 (1991)). Because prosecutors lack absolute immunity for all official acts, courts "have rejected bright-line rules that would treat the timing of the prosecutor's action (*e.g.* pre- or post[-]indictment), or its location (*i.e.* in- or out-of-court), as dispositive." *Fogle*, 957 F.3d at 163 (citation modified). Thus, only after detailed examination can a court distinguish "between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial" versus "the detective's role in searching for the clues and corroboration that might give him probable cause to recommend" an arrest. *Buckley*, 509 U.S. at 273. The prosecutor, however, "must show that the conduct triggering absolute immunity clearly appears on the face of the complaint." *Fogle*, 957 F.3d at 161 (citation modified).

### 3. Application of the Legal Standards to Individual DAs

Unfortunately, the trial court, although it cited *Buckley* and *Kulwicki*, failed to carefully dissect the DA Appellees' alleged misconduct. *See generally* Trial Ct. Op. Instead, the court grouped all of the DA Appellees' alleged misconduct together and labeled them as official acts without sufficient explanation. *See id.* at 4-5. Given that no bright line divides prosecutorial and non-prosecutorial conduct, we are unconvinced by the court's broad-brush reasoning. *See Fogle*, 957 F.3d at 163; *Kulwicki*, 969 F.2d at 1465. Because the court's cursory treatment did not reflect the case law's meticulous analysis, we must remand.

On remand, the trial court must identify each alleged act of misconduct, determine what function each alleged act served, and explain why each such act was prosecutorial or non-prosecutorial. *See, e.g.*, *Fogle*, 957 F.3d at 160-64; *Buckley*, 509 U.S. at 273. After viewing the well-pleaded facts in Appellants' favor, it may be that some or all of the individual DA Appellees have absolute immunity for prosecutorial

12

acts. *See, e.g.*, *Fogle*, 957 F.3d at 160 (listing examples). For non-prosecutorial acts, the court must address qualified immunity, *see Buckley*, 509 U.S. at 273, which we discuss below. In sum, while absolute immunity may protect some DA Appellees for their prosecutorial conduct, different immunity standards govern Police Appellees and any non-prosecutorial conduct by DA Appellees.

## B. Qualified Immunity

### 1. Legal Standards

Before elaborating on qualified immunity, we reiterate the court's role in resolving preliminary objections. Critically, at the preliminary objection stage, courts must accept all well-pleaded facts as true; without an evidentiary hearing, the court cannot resolve disputed factual questions. *See* Pa.R.Civ.P. 1028(c)(2); *Raynor*, 243 A.3d at 52. Disputed factual questions, however, often arise in deciding qualified immunity. *See Curley v. Klem*, 298 F.3d 271, 278 (3d Cir. 2002) (stressing "the reality that factual disputes often need to be resolved before determining whether the defendant's conduct" is subject to qualified immunity); *see also Thomas v. Indep. Twp.*, 463 F.3d 285, 299 (3d Cir. 2006) (recognizing "the district court is oftentimes hard-pressed to conduct a fact-specific qualified immunity analysis at an early stage in the litigation").[7]

Qualified immunity, unlike absolute immunity, protects government officials from civil liability unless they violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson*, 555 U.S. at 231 (citation modified). "Clearly established means that, at the time of

---

[7] *Thomas* resolved the tension between federal notice pleading and qualified immunity's "fact-specific inquiry." *Thomas*, 463 F.3d at 299 (citation modified) (citing cases); *cf. Curley*, 298 F.3d at 278 ("Just as the granting of summary judgment is inappropriate when a genuine issue exists as to any material fact, a decision on qualified immunity will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis."). Simply, courts recognize that immunity decisions are premature when disputed facts could exist.

the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (citation modified).

To resolve qualified immunity on preliminary objections, courts must analyze two prongs: (1) whether the facts alleged "make out a violation of a constitutional right," and (2) whether the "right at issue was clearly established at the time of [the defendants'] alleged misconduct." *Pearson*, 555 U.S. at 232 (citation modified); *Ashcroft v. Iqbal*, 556 U.S. 662, 666, 672 (2009). We have discretion to decide which prong to address first.[8] *Pearson*, 555 U.S. at 236.

*a. The First Prong – Pleading a Constitutional Violation*

For the first prong, we examine whether the plaintiffs' alleged facts, which we accept as true, show that the defendants' conduct violated a constitutional right. *Kedra v. Schroeter*, 876 F.3d 424, 435 (3d Cir. 2017) (explaining that the first prong goes "to whether a *plaintiff* sufficiently pleaded a constitutional violation" (emphasis added) (citation modified)); *Pinkney*, 648 F. Supp. 3d at 644 (holding that the alleged facts support a Fourth Amendment violation); *cf. Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021) (noting, in resolving summary judgment, that "the first prong - a constitutional inquiry - requires us to consider the following question: Taken in the light most favorable to the party asserting the injury, do the

---

[8] We have discretion because "when qualified immunity is asserted at the pleading stage, the precise factual basis for the [plaintiffs'] claims may be hard to identify." *Pearson*, 555 U.S. at 238-39 (citation modified); *Thomas*, 463 F.3d at 299. In such cases, we may decide to examine whether the alleged constitutional right was clearly established. *See Pearson*, 555 U.S. at 237, 239 (stating we may "quickly and easily decide that there was no violation of clearly established law before turning to the more difficult question [of] whether the relevant facts make out a constitutional question at all"). In other cases, "it often may be difficult to decide whether a right is clearly established without deciding precisely what the existing constitutional right happens to be. In some cases, a discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all." *Id.* at 236 (citation modified).

14

facts alleged show the officer's conduct violated a constitutional right?" (citation modified)).

### b. The Second Prong – Clearly Established Right[9]

The second prong addresses whether defendants are liable because they should have known their conduct was unlawful at the time they allegedly violated the plaintiffs' clearly established right (as defined by the court). *See Reichle v. Howards*, 566 U.S. 658, 664 (2012). This standard requires that the law "clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted. This requires a high degree of specificity." *Wesby*, 583 U.S. at 63 (citation modified).

To satisfy that level of specificity, the second prong itself requires a "two-part inquiry." *Jefferson v. Lias*, 21 F.4th 74, 81 (3d Cir. 2021) (citation omitted). For the first part of this two-part inquiry, "we must define the right allegedly violated at the appropriate level of specificity. This requires us to frame the right *in light of the specific context of the case, not as a broad general proposition*." *Id.* (emphasis added) (citation modified); *Wesby*, 583 U.S. at 63 (noting courts define the right).[10]

[9] Specifically, the "clearly established inquiry at the second prong . . . goes not to whether a plaintiff sufficiently pleaded a constitutional violation (the question answered at the first prong), but to whether the right allegedly violated—defined in terms of the particularized factual context of that case—was a clearly established . . . constitutional right of which a reasonable officer would have known." *Kedra*, 876 F.3d at 435 (citation modified).

[10] To illustrate this specificity requirement, the Fourth Amendment "right to be free from warrantless searches of one's home unless the searching officers have probable cause and there are exigent circumstances" is insufficiently specific. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). If a court defines a "clearly established" right at that high level of generality, *i.e.*, equivalent to the first prong's requirement to plead a constitutional violation, then no officers could ever invoke qualified immunity. *Id.* at 639-40 (rejecting the lower court's invocation of the Fourth Amendment as a "clearly established" right because "if the test of 'clearly established law' were to be applied at this level of generality, it would bear no relationship to the 'objective legal reasonableness' [of the action]. Plaintiffs would be able to convert the rule of qualified immunity . . . into a rule of

For example, in *Jefferson*, the plaintiff proposed "narrowly" defining the clearly established right. *Jefferson*, 21 F.4th at 81. The plaintiff's proposed right "bars an officer from opening gunfire into the driver's side window of a fleeing vehicle passing in front of him if the driver is not believed to be armed, did not previously act in a menacing manner, and if there is no immediate danger to the officer or bystanders." *Id.* (citation modified). Simply, the plaintiff argued that a reasonable officer in the defendant's shoes should have known his conduct violated this "clearly established" right. *See id.* The *Jefferson* defendant countered by "broadly" defining "the right at a much higher level of generality, contending that it is not a violation of a clearly-established constitutional right to shoot at a fleeing driver to protect those who his or her flight might endanger." *Id.* (citation modified).[11] In other words, the defendant argued that even if he violated the Fourth Amendment (first prong), he could not have known his conduct was unlawful in the factual situation at bar (second prong). *See id.*; *Wesby*, 583 U.S. at 63.[12]

For the second part of this two-part inquiry, courts resolve whether the specifically defined "right was sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is an objective (albeit fact-specific) question, where an officer's subjective beliefs are irrelevant." *Jefferson*, 21 F.4th at 81 (citation modified); *Kedra*, 876 F.3d at 435. A right (defined by part one)

---

virtually unqualified liability simply by alleging violation of extremely abstract rights" (citation modified)). Hence, the right must be defined by the facts at issue. *See id.*

[11] Somewhat counterintuitively, the defendant defined the right as broadly as possible under the facts of the case, *i.e.*, it would *not* be "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Wesby*, 583 U.S. at 63 (citation modified); *Jefferson*, 21 F.4th at 81.

[12] *Jefferson* took a middle ground and defined "the right as follows: a suspect fleeing in a vehicle, who has not otherwise displayed threatening behavior, has the constitutional right to be free from the use of deadly force when it is no longer reasonable for an officer to believe his or others' lives are in immediate peril from the suspect's flight." *Jefferson*, 21 F.4th at 81 (holding that because the right was clearly established, the officer was not entitled to qualified immunity).

16

is sufficiently clear when grounded in well-settled precedent, *i.e.*, courts have definitively resolved the constitutionality of the officer's conduct. *Wesby*, 583 U.S. at 63. Precedent "must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority. It is not enough that the [right] is suggested by then-existing precedent."[13] *Id.* (citation modified). "An answer in the negative to either prong entitles an [official] to qualified immunity." *Peroza-Benitez*, 994 F.3d at 165 (citation modified).

### c. The Pinkney Framework – Objective, Fact-Specific Question

"Regarding the second [prong], in the context of a § 1983 action alleging a violation of the Fourth Amendment, the inquiry is whether a reasonable officer could have believed that his or her conduct was lawful, in light of the clearly established law and the information in the officer's possession." *Pinkney*, 648 F. Supp. 3d at 644 (citation modified). "The standard for determining the reasonableness of an official's belief in the existence of probable cause is whether a reasonably well-trained officer would have known that his affidavit failed to establish probable cause and that he therefore should not have applied for the warrant under the conditions." *Id.* at 645 (citation modified).

An officer's "subjective belief in the truth of the facts stated in the affidavit do not *per se* establish the objective reasonableness of the police officer's actions and his right to qualified immunity," even if a judge issued the warrant. *Id.* at 644 (citation modified). The affidavit may be "so lacking in indicia of probable cause as to render the officer's [subjective] belief" objectively unreasonable. *Id.* (citation modified); *Jefferson*, 21 F.4th at 81. Therefore, the trial court must examine whether: (1) the "officer knowingly and deliberately, or with a reckless disregard for

---

[13] Thus, the plaintiff would favor defining the right based on authority holding such conduct unconstitutional. *Wesby*, 583 U.S. at 63.

the truth, made false statements or omissions that create a falsehood in applying for a warrant;" and (2) "such statements or omissions are material, or necessary, to the finding of probable cause."[14] *Pinkney*, 648 F. Supp. 3d at 641 (citation modified).

Importantly, as *Pinkney* recognized, whether an officer acted recklessly is inherently a factual issue that cannot be resolved on a motion to dismiss without factual development. *Id.* at 641-42. Further, courts must "perform literal, word-by-word reconstructions of challenged affidavits" to determine whether the reconstructed affidavit would establish probable cause. *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 470 (3d Cir. 2016). Specifically, the trial "court must identify any improperly asserted or omitted facts and, if it determines there were reckless misrepresentations or omissions, excise the offending inaccuracies and insert the facts recklessly omitted from the affidavit and assess whether the reconstructed affidavit would establish probable cause." *Id.* (citation modified).

### 2. Arguments

Appellants assert their complaint pleaded sufficient facts of a constitutional violation, *i.e.*, Police Appellees "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions in a warrant

---

[14] *Pinkney* elaborated on the first element: "an assertion is made with reckless disregard for the truth when viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information reported. To determine whether information was recklessly omitted, the inquiry is whether the officer withheld a fact in his ken that any reasonable person would have known . . . [and] was the kind of thing the judge would wish to know." *Pinkney*, 648 F. Supp. 3d at 641 (citation modified). "If the court determines that information was asserted or omitted in an affidavit of probable cause with at least reckless disregard for the truth, the second element requires that the court perform a word-by-word reconstruction of the affidavit and determine whether the reconstructed affidavit would establish probable cause." *Id.* (citation modified); *Goodwin v. Conway*, 836 F.3d 321, 327 (3d Cir. 2016) (explaining that "omissions and misrepresentations are material if a reconstructed warrant application containing the alleged omissions and excising the alleged inaccuracies would no longer establish probable cause" (citation modified)).

18

application and the statements or omissions were material to the finding of probable cause." Appellants' Br. at 24. They point to GPS records showing Bennett could not have been present, inconsistent witness identifications, and Police Appellees' failure to investigate alternative suspects. *Id.* at 28-29. Accordingly, Appellants argue "a reconstructed warrant application containing the alleged omissions would no longer establish probable cause." *Id.* at 29.

Appellants relatedly argue they sufficiently pleaded that DDA Ramaley approved a photo array and ADA Byrnes-Hong-Barco assisted with the Facebook search warrants during the investigation. *Id.* at 15. Further, they assert ADA Werner assisted the police's investigation with, *inter alia*, search warrants, attending witness interviews, and viewing the crime scene. *Id.* at 13, 15-16.

All Appellees generally counter that Appellants did not sufficiently plead a constitutional violation. Specifically, Police Appellees maintain that GPS records did not negate any probable cause for arrest and they were not constitutionally required to investigate any alleged alibi. Police Appellees' Br. at 26-30. Detective Triolo, per Police Appellees, appropriately relied on witness identifications "in determining she had probable cause" to arrest and any potentially exculpatory evidence did not "undermine" such probable cause. *Id.* at 28.

Similarly, DA Appellees summarily reason that ADA Byrnes-Hong-Barco's conduct, *e.g.*, assisting the police with Facebook warrants, did not violate any clearly established constitutional right. DA Appellees' Br. at 21-22, 27-28. They assail the factual allegations directed to DDA Ramaley and ADA Werner as boilerplate, vague, and conclusory. *Id.* at 22-23. In their view, Appellants alleged no facts showing that DA Appellees "committed some . . . obvious constitutional violation." *Id.* at 28. Nevertheless, DA Appellees generally allege that their alleged

investigative conduct was objectively reasonable and, thus, subject to qualified immunity. *Id.* at 27-28.

### *3. Application of the Legal Standards*

In this case, applying the qualified immunity framework to the specific allegations against each defendant group underscores why we must remand for proper factual development. The trial court simply erred by summarily finding qualified immunity without applying the *Pearson* framework or addressing the procedural limitations at this preliminary objection stage. Specifically, the court failed to (1) apply the two-prong *Pearson* analysis to each defendant's alleged conduct; (2) recognize that an evidentiary hearing was necessary for factual development; and (3) reconstruct the warrant under *Dempsey*. *See also* Pa.R.Civ.P. 1028(c)(2).

For example, Appellants have alleged sufficient facts that, if proven, could establish a Fourth Amendment violation by Detective Triolo. She allegedly omitted GPS records from arrest warrant affidavits, mischaracterized inconsistent witness statements, and failed to investigate alternative suspects. *Cf. Pinkney*, 648 F. Supp. 3d at 641-42. However, applying the *Pinkney* framework reveals why remand is necessary: determining whether Detective Triolo acted knowingly or recklessly requires factual development that cannot be resolved on preliminary objections. *See id.* To paraphrase *Pinkney*, whether Detective Triolo "acted recklessly was a factual issue that could not be decided on" preliminary objections. *See id.* This inquiry requires evidence about what Detective Triolo actually knew, when she knew it, and whether her conduct demonstrated serious doubts about the truth of her statements—findings that cannot be resolved merely by accepting the pleaded facts as true. *See id.*

For Sergeants Glick and Vollberg, on remand, the court must first determine whether Appellants have alleged sufficient facts to satisfy the first *Pearson* prong and then address whether the specifically defined right was clearly established. As with Detective Triolo, the court may potentially require the same kind of evidentiary development that *Pinkney* identified for the underlying constitutional violation. *See id.* To the extent that Police Appellees contend GPS records did not conclusively establish Bennett's location, any such dispute must also be resolved through the *Pinkney* and *Dempsey* analysis.

For the DA Appellees, the court must first determine which conduct is non-prosecutorial (as addressed above) before resolving qualified immunity. Again, this determination requires meticulous review of individual acts that may require further factual development. *See Fogle*, 957 F.3d at 160. While DA Appellees contend the allegations are vague and conclusory, we must accept well-pleaded facts as true and resolve qualified immunity's "fact-specific inquiry" after a hearing.

For all these reasons, we must remand because the trial court could not resolve preliminary objections invoking qualified immunity without an evidentiary hearing. *See* Pa.R.Civ.P. 1028(c)(2). The court cannot make qualified immunity determinations based solely on well-pleaded facts. On remand, the court must resolve all factual disputes essential to resolving immunity properly, including any reckless conduct. *See Pearson*, 555 U.S. at 232; *Pinkney*, 648 F. Supp. 3d at 641-42; *cf. Rehab*, 283 A.3d at 271-72.[15]

---

[15] The trial court stated that to "overcome qualified immunity, a plaintiff has the burden of showing that the defendant" violated a plaintiff's constitutional right that was clearly established. Trial Ct. Op. at 6. To be clear, in resolving preliminary objections, a "plaintiff has no obligation to plead a violation of clearly established law," *i.e.*, the second prong, "in order to avoid dismissal on qualified immunity grounds" because a defendant has the burden of pleading the affirmative defense of qualified immunity, *i.e.*, the two-part *Jefferson* inquiry. *See Thomas*, 463 F.3d at 293

## C. Derivative Municipal Liability Under *Monell*

"When a suit against a municipality is based on § 1983, the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom." *Mulholland v. Gov't Cnty. of Berks*, 706 F.3d 227, 237 (3d Cir. 2013) (citation modified). The municipality "may not be held liable for constitutional torts under § 1983 on a vicarious liability theory rooted in *respondeat superior*, but it can be held responsible as an entity when the injury inflicted is permitted under its adopted policy or custom." *Id.* (citation modified). Thus, "to establish municipal liability under § 1983," the plaintiffs must show a constitutional deprivation that "was the result of an official government policy or custom." *Id.* at 238 (citation modified). "If there is no violation in the first place, [then] there can be no derivative municipal claim." *Id.* at 238 n.15 (citation modified). The term "municipality" can include a district attorney sued in an official capacity. *See Monell*, 436 U.S. at 690-91 & n.55.

Instantly, Section 1983 municipal liability depends entirely on resolving underlying constitutional violations by the individual defendants. Thus, a trial court's immunity decision proves dispositive of these derivative claims. But as set forth above, the trial court erred in how it resolved the underlying constitutional violations. It erred by failing to, *inter alia*, carefully dissect the DA Appellees' conduct under *Buckley* and apply the *Pearson* framework for qualified immunity. On remand, if the court holds that Appellants have alleged constitutional violations, then Appellants may have triggered *Monell* derivative liability claims. Accordingly, we vacate the trial court's order dismissing these claims against the City of

---

(footnote omitted); *Kedra*, 876 F.3d at 435; *see also Jefferson*, 21 F.4th at 81; *Steiner*, 968 A.2d at 1258 n.11.

Pittsburgh and the DA's Office as premature. *See Jefferson*, 21 F.4th at 87. However, we affirm, on other grounds, the dismissal of the *Monell* claim against DA Zappala in his official capacity as duplicative of the claim against the DA's Office. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985); *Robinson v. Dist. of Columbia*, 403 F. Supp. 2d 39, 49 (D.D.C. 2005) ("Based upon the understanding that it is duplicative to name both a government entity and the entity's employees in their official capacity, courts have routinely dismissed corresponding claims against individuals named in their official capacity as redundant and an inefficient use of judicial resources." (citation modified)); *see also Marshall*, 300 A.3d at 548 n.17.

### D. Failure-to-Intervene Claims[16]

Appellants also assert failure-to-intervene claims that similarly depend on finding underlying constitutional violations. Appellants' Br. at 50-54. In Appellants' view, such claims are not limited only to "instances of excessive force." *Id.* at 50. Police and PO Appellees counter that the only valid Section 1983 failure-to-intervene claim "recognized by the courts is in the context of excessive force." Police Appellees' Br. at 38; *accord* PO Appellees' Br. at 5-7.

Here, because the trial court misapplied the law in immunizing all Appellees, the court did not address these claims. *See* Trial Ct. Op. at 7. Because the court, on remand, may hold that Appellants have alleged constitutional violations, it would then have to resolve whether these claims survive preliminary objections. We next address Appellants' state law claims, which are governed by different immunity doctrines.

---

[16] In the Third Circuit, a failure-to-intervene claim requires a plaintiff to allege that certain officials failed to "protect a victim" from another official's use of excessive force. *See Weimer*, 972 F.3d at 191 (citation modified). *Weimer* did not extend the duty to include "unconstitutional investigations." *Id.*

**E. State Law Claims**

*1. Pennsylvania Constitutional Claims*

Appellants succinctly argue violations of article I, sections 1, 8, and 9 of the Pennsylvania Constitution as an independent basis for relief. Appellants' Br. at 5. Appellants do not develop their argument. *See generally id.* Police and DA Appellees counter that no private right of action exists for state constitutional violations. *See* Police Appellees' Br. at 37-38; DA Appellees' Br. at 39-40.

"To date, neither Pennsylvania statutory authority, nor appellate case law has authorized the award of monetary damages for a violation of the Pennsylvania Constitution." *Jones v. City of Phila.*, 890 A.2d 1188, 1208 (Pa. Cmwlth. 2006) (*en banc*). Plaintiffs may not raise state constitutional claims under Section 1983. *See Benn v. Universal Health Sys., Inc.*, 371 F.3d 165, 174 (3d Cir. 2004). Here, the trial court dismissed the claims solely based on all Appellees' immunity. Notwithstanding the trial court's error, we affirm the dismissal of Appellants' state constitutional claims based on *Jones*. *See Jones*, 890 A.2d at 1208; *Mazer*, 337 A.2d at 562 n.6.

*2. Pennsylvania Tort Claims*

Appellants have also alleged that all individual Appellees engaged in conduct constituting "false imprisonment" and "malicious prosecution."[17] Am. Compl. ¶¶ 273, 282. Appellants derivatively allege Appellees' conduct violated their

---

[17] "The elements of false imprisonment are (1) the detention of another person, and (2) the unlawfulness of such detention. An arrest based upon probable cause would be justified, regardless of whether the individual arrested was guilty or not." *Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994) (citation omitted). The elements of malicious prosecution are (1) the defendants initiated criminal proceedings; (2) the criminal proceeding ended in the plaintiffs' favor; (3) the proceedings were initiated without probable cause; and (4) the defendants acted maliciously or for a purpose other than bringing the plaintiffs to justice. *See Haefner v. Burkey*, 626 A.2d 519, 521 (Pa. 1993); *see generally Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 791-92 (3d Cir. 2000) (distinguishing the common law tort from a Section 1983 malicious prosecution claim).

federal constitutional rights. *Id.* ¶¶ 273, 275, 281-82. Appellants argue their tort claims against Police and DA Appellees "are not barred by the Political Subdivision Tort Claims Act" (Act), codified at 42 Pa.C.S. §§ 8541-8542. Appellants' Br. at 54, 56. They are not barred, Appellants reason, because the Act excludes willful misconduct. *Id.* All individual Police and DA Appellees engaged in such misconduct, *i.e.*, they arrested Appellants despite knowing Bennett was at home and that alternative suspects had not been investigated. *Id.* at 55. Further, per Appellants, DA Appellees' misconduct was "investigatory or administrative" in nature, which is excluded from the scope of any high public official immunity. *Id.* at 56 (citing *Sealander v. Brague* (M.D. Pa., No. 17-cv-594, filed Nov. 7, 2019), 2019 WL 5829373, at *3 n.1).

DA Appellees succinctly disagree. DA Appellees' Br. at 38-39. In their view, they retain high public official immunity for any official conduct, regardless of whether such conduct was in an administrative or investigative capacity.[18] *Id.* Police Appellees retort that because they had probable cause to arrest, the state law claims must fail. Police Appellees' Br. at 41, 44. They also allege they have immunity under the Act. *Id.* at 42-45.

Generally, under the Act, local agencies are immune from liability for intentional torts by employees acting *within* the scope of their employment. *See* 42 Pa.C.S. § 8541; *id.* § 8542(a)(2) (permitting liability for negligence); *see also* *Crowell v. City of Phila.*, 613 A.2d 1178, 1183-84 (Pa. 1992) (prohibiting "liability upon a governmental unit based upon a theory of vicarious liability" (footnote omitted)).[19] Local agency employees include police officers, who are ordinarily

---

[18] DA Appellees did not argue they had immunity under the Act. *See* DA Appellees' Br. at 38-39. The parties did not otherwise elaborate on the scope of a prosecutor's duties.

[19] A "local agency" is any "government unit other than the Commonwealth government," 42 Pa.C.S. § 8501, which includes the City of Pittsburgh, Allegheny County, and the DA's Office.

25

immune under the Act, unless they engage in willful misconduct. *See Renk*, 641 A.2d at 293.[20] Willful misconduct occurs when the officer "himself actually understood that what he was doing was illegal but chose to do it anyway." *Gleeson v. Robson* (M.D. Pa., No. 3:CV-02-1747, filed May 6, 2005), 2005 WL 1210948, at \*28 (citation modified); *Kuzel v. Krause*, 658 A.2d 856, 860 (Pa. Cmwlth. 1995) (*en banc*).

Under high public official immunity, prosecutors are "immune from suit for actions taken in [their] official capacity," which has been defined as conduct "taken in the course of the official's duties or powers and within the scope of [their] authority." *Durham*, 772 A.2d at 69 (citation modified).[21] Those powers include "whether to initiate formal criminal proceedings, to select . . . criminal charges . . . , to negotiate plea bargains, to withdraw charges . . . , and, ultimately, to prosecute or dismiss charges at trial." *Commonwealth v. Cosby*, 252 A.3d 1092, 1131 (Pa. 2021) (citation modified).[22]

In examining whether a prosecutor's actions were taken within the

---

DA Appellees' preliminary objections asserted that the DA's Office is a public entity that could invoke the Act. DA Appellees' Prelim. Objs. ¶ 74.

[20] In *Renk*, a federal jury found the officer liable for the state tort claim of false imprisonment. *Renk*, 641 A.2d at 291. The jury's finding of tort liability, however, did not explicitly address whether the officer (1) knew he lacked probable cause when he "intentionally arrested" the plaintiff, or (2) simply lacked probable cause. *Id.* at 294. The *Renk* Court explained that "a jury could find a police officer liable for" false imprisonment even if the officer did not intentionally or "deliberately arrest a person knowing that he lacked probable cause to do so." *Id.* at 293-94.

[21] Specifically, the high public official's actions must be "in the course of the official's duties or powers and within the scope of his authority, or as it is sometimes expressed, within his jurisdiction." *Durham*, 772 A.2d at 69 (citation modified); *see generally Winig v. Off. of Dist. Att'y of Phila.* (Pa., No. 32 EAP 2023, filed Nov. 19, 2025), slip op. at 12-13, 24.

[22] *Accord, e.g.*, *Jaslar v. Zavada* (M.D. Pa., No. 3:CV-05-2080, filed Jan. 12, 2009), 2009 WL 82553, at \*1 (holding the DA was entitled to high public official immunity for approving the filing of charges); *Njie v. Livingston* (M.D. Pa., No. 3:CV-08-2263, filed Feb. 9, 2010), 2010 WL 569551, at \*6 (granting the prosecutors' motion to dismiss for "pursuing criminal charges" against the plaintiff under high public official immunity).

course and scope of their authority, we examine whether those actions were "closely related to the performance of those official duties" or "to a matter pending" before the prosecutor. *McCormick v. Specter*, 275 A.2d 688, 689 (Pa. Super. 1971). The *McCormick* Court recognized the "readily apparent" "difficulties" that a trial court would have in applying this test but posited that "some guidance" was better than none. *Id.* (citation modified). For example, a prosecutor assisting an officer with drafting the affidavit of probable cause falls within the scope of a prosecutor's authority. *Sealander*, 2019 WL 5829373, at *7 (dismissing abuse of process claim against the prosecutor).[23] In sum, a prosecutor's actions *within* their course and scope of authority, even with improper motive, *i.e.*, malice, fall within the scope of immunity. But actions *outside* the course and scope of authority, regardless of malice, are outside the scope of immunity. *See also* 42 Pa.C.S. § 8541.

Here, because Appellants explicitly allege that the City of Pittsburgh, Allegheny County, and the DA's Office are liable for their employees' intentional torts, we agree those entities are immune. *See* 42 Pa.C.S. §§ 8541-8542; *see also Crowell*, 613 A.2d at 1183.

As for DA and Police Appellees, both tort claims require Appellants to allege facts establishing, *inter alia*, the absence of probable cause and willful misconduct. *See Renk*, 641 A.2d at 292-93; *Haefner*, 626 A.2d at 521. Appellants'

---

[23] *See also Teeple v. Carabba* (E.D. Pa., No. 07-2976, filed Dec. 22, 2009), 2009 WL 5033964, at *19-20 (granting DDA summary judgment for state law claims based on high public official immunity because the plaintiff failed to challenge the DDA's *investigatory* conduct); *cf. Burns v. Reed*, 500 U.S. 478, 494, 496 (1991) (stating that absolute immunity protects the judicial, not investigative, process). *But see Cleaver v. Piche* (W.D. Pa., No. 2:15-cv-79, filed Feb. 5, 2016), 2016 WL 454304, *4 (suggesting that high public official immunity encompasses "all conduct within the course of the official's duties," including "prosecutorial, advocative, investigative[,] or administrative conduct" (citation modified)); *Brown v. Chardo* (M.D. Pa., No. 1:11-cv-638, filed March 22, 2012), 2012 WL 983553, *10 (same) (citing *Matson v. Margiotti*, 88 A.2d 892, 895 (Pa. 1952)). Regardless of the formulation, a prosecutor acting with malice *within* the scope of their authority has immunity; a prosecutor exceeding the scope of their authority does not.

complaint pleaded that DA and Police Appellees were aware of exculpatory GPS records, inconsistent witness identifications, and existence of alternative suspects, *i.e.*, the absence of probable cause and willful misconduct.

Unfortunately, because of our disposition of the other claims, we must remand. If on remand, the trial court determines that Police Appellees had probable cause, then they would prevail on their preliminary objections to these state claims. *See Pinkney*, 648 F. Supp. 3d at 647 (denying the officer's motion to dismiss the false imprisonment and malicious prosecution claims because probable cause did not exist after reconstructing the affidavit).[24] As for DA Appellees, on remand, the trial court must analyze whether their conduct was "closely related to the performance of those official" prosecutorial duties and within the scope of their authority. *See Durham*, 772 A.2d at 69; *McCormick*, 275 A.2d at 689. Further, because of the limited record and procedural posture, an evidentiary hearing may be required to resolve DA Appellees' state immunity.

## IV. CONCLUSION

We affirm the dismissal of claims where Appellants failed to appeal or where no viable cause of action exists. However, we vacate and remand the immunity determinations that require proper legal analysis and, where necessary, factual development.

Accordingly, we affirm the trial court's dismissal of Count VII (individual liability against Carlino), Count X (failure to intervene against DA Appellees), Count XI (conspiracy against all Appellees), and Counts XII and XIII against POs Carlino, Kotanchik, and Anderson. We affirm the dismissal of all state

___

[24] *Cf. Alleyne v. Pirrone*, 180 A.3d 524, 544 (Pa. Cmwlth. 2018) (reversing denial of judgment notwithstanding the verdict for malicious prosecution and false imprisonment because record established probable cause for arrest).

constitutional claims because Pennsylvania law provides no private right of action for monetary damages based on state constitutional violations. We affirm on other grounds the dismissal of Count VI against DA Zappala in his official capacity, and Counts XII and XIII against the City of Pittsburgh, the DA's Office, and Allegheny County.

For the remaining federal and state claims, we vacate the trial court's immunity determinations. On remand, the court must: (1) apply the *Buckley* framework to carefully dissect each DA Appellee's alleged conduct and determine whether each specific act was prosecutorial, administrative, or investigative in nature; (2) apply the *Pearson* qualified immunity analysis to each DA Appellee's non-prosecutorial conduct and all Police Appellees, including reconstructing the affidavit under *Pinkney*; (3) resolve high public official immunity for DA Appellees under the *Durham* and *McCormick* standards; (4) determine immunity under the Act for Police Appellees regarding state law claims; (5) address *Monell* and failure-to-intervene claims based on any constitutional violations found; (6) conduct an evidentiary hearing to resolve factual issues material to resolving immunity and for proper appellate review; and (7) thoroughly address all remaining preliminary objections.

_____
**LORI A. DUMAS, Judge**

Judge McCullough did not participate in the decision in this case.

29

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Kristen Blackwell, as parent and :  **CASES CONSOLIDATED**
natural guardian of and on behalf :
of Kristian Blackwell, :
                Appellant :
  :
  :  No. 258 C.D. 2022
          v. :
  :
City of Pittsburgh, Janine N. Triolo, :
James Glick, William Vollberg, :
David O'Neil, Joseph Fabus, Peter :
Bechtold, Gabriel Figueroa, Jay :
Johnson, Allegheny County, Russell :
Carlino, Matt Anderson, Scott :
Kotanchik, Allegheny County District :
Attorney's Office, Stephen A. :
Zappala, Jr., Stephie-Anna Ramaley, :
Rebecca A. Walker, Alicia Werner, :
and Melissa Byrnes-Hong-Barco :

Leandre Sims, :
                Appellant :
  :  No. 259 C.D. 2022
          v. :
  :
City of Pittsburgh, Janine N. Triolo, :
James Glick, William Vollberg, :
David O'Neil, Joseph Fabus, Peter :
Bechtold, Gabriel Figueroa, Jay :
Johnson, Allegheny County, Russell :
Carlino, Matt Anderson, Scott :
Kotanchik, Allegheny County District :
Attorney's Office, Stephen A. :
Zappala, Jr., Stephie-Anna Ramaley, :
Rebecca A. Walker, Alicia Werner, :
and Melissa Byrnes-Hong-Barco :

Jabril Lee,

     Appellant

    v.

City of Pittsburgh, Janine N. Triolo,
James Glick, William Vollberg,
David O'Neil, Joseph Fabus, Peter
Bechtold, Gabriel Figueroa, Jay
Johnson, Allegheny County, Russell
Carlino, Matt Anderson, Scott
Kotanchik, Allegheny County District
Attorney's Office, Stephen A.
Zappala, Jr., Stephie-Anna Ramaley,
Rebecca A. Walker, Alicia Werner,
and Melissa Byrnes-Hong-Barco

     :
     :
     :  No. 260 C.D. 2022

Brian Bennett,

     Appellant

    v.

City of Pittsburgh, Janine N. Triolo,
James Glick, William Vollberg,
David O'Neil, Joseph Fabus, Peter
Bechtold, Gabriel Figueroa, Jay
Johnson, Allegheny County, Russell
Carlino, Matt Anderson, Scott
Kotanchik, Allegheny County District
Attorney's Office, Stephen A.
Zappala, Jr., Stephie-Anna Ramaley,
Rebecca A. Walker, Alicia Werner,
and Melissa Byrnes-Hong-Barco

     :
     :
     :  No. 606 C.D. 2022

# **O R D E R**

AND NOW, this 20th day of November, 2025, we AFFIRM in part and

VACATE in part the February 18 and May 27, 2022 orders entered by the Court of Common Pleas of Allegheny County (trial court) in favor of (1) Probation Officer Russell Carlino; (2) the City of Pittsburgh, Detectives Janine N. Triolo, David O'Neil, Joseph Fabus, Peter Bechtold, Gabriel Figueroa, and John Johnson (also known as Jay Johnson), and Sergeants James Glick and William Vollberg (collectively, Police Appellees); (3) Allegheny County, Allegheny County District Attorney's Office, District Attorney (DA) Stephen A. Zappala, Jr., deputy district attorney (DDA) Stephie-Anna Ramaley, DDA Rebecca A. Walker, assistant district attorney (ADA) Alicia Werner, and ADA Melissa Byrnes-Hong-Barco (collectively, DA Appellees); and (4) Matt Anderson and Scott Kotanchik, and REMAND for further proceedings.

We VACATE all immunity determinations and REMAND for further proceedings. On remand, the trial court must: (1) apply the *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993) framework to carefully dissect each DA Appellee's alleged conduct and determine whether each specific act was prosecutorial, administrative, or investigative in nature; (2) apply the *Pearson v. Callahan*, 555 U.S. 223 (2009) qualified immunity analysis to each DA Appellee's non-prosecutorial conduct and all Police Appellees, including reconstructing the affidavit under *Pinkney v. Meadville*, 648 F. Supp. 3d 615 (W.D. Pa. 2023); (3) resolve high public official immunity for DA Appellees under the *Durham v. McElynn*, 772 A.2d 68 (Pa. 2001) and *McCormick v. Specter*, 275 A.2d 688 (Pa. Super. 1971) standards; (4) determine immunity under the Political Subdivision Tort Claims Act for Police Appellees regarding state law claims; (5) address the *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978) and failure-to-intervene claims based on any constitutional violations found; (6) conduct an evidentiary hearing to resolve

factual issues material to resolving immunity and for proper appellate review; and (7) thoroughly address all remaining preliminary objections. The trial court's order is otherwise AFFIRMED as set forth herein. Jurisdiction relinquished.

LORI A. DUMAS, Judge